# 20-3806(L)

20-3815(CON)

# United States Court of Appeals for the Second Circuit

STATE OF NEW YORK, COMMONWEALTH OF PENNSYLVANIA,
STATE OF CALIFORNIA, STATE OF COLORADO, STATE OF DELAWARE,
DISTRICT OF COLUMBIA, STATE OF ILLINOIS, STATE OF MARYLAND,
COMMONWEALTH OF MASSACHUSETTS, STATE OF MICHIGAN,
STATE OF MINNESOTA, STATE OF NEW JERSEY, STATE OF NEW MEXICO
STATE OF OREGON, STATE OF RHODE ISLAND, STATE OF WASHINGTON,
STATE OF VERMONT, COMMONWEALTH OF VIRGINIA,

*Plaintiffs-Appellees*,

v.

MARTIN J. WALSH, Secretary of the United States Department of Labor,
UNITED STATES DEPARTMENT OF LABOR, UNITED STATES OF AMERICA,

*Defendants-Appellants*,

*(caption continues inside front cover)*

On Appeal from the United States District Court
for the Southern District of New York

## BRIEF FOR APPELLEES

BARBARA D. UNDERWOOD
 *Solicitor General*
STEVEN C. WU
 *Deputy Solicitor General*
JUDITH N. VALE
 *Senior Assistant Solicitor General*
FIONA J. KAYE
 *Assistant Attorney General*
  *of Counsel*
*(Counsel listing continues on signature pages.)*

LETITIA JAMES
 *Attorney General*
 *State of New York*
Attorney for Appellees
28 Liberty Street
New York, New York 10005
(212) 416-6274

Dated: April 16, 2021

*(caption continues from front cover)*

INTERNATIONAL FRANCHISE ASSOCIATION, THE CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA, HR POLICY ASSOCIATION, NATIONAL RETAIL FEDERATION, ASSOCIATED BUILDERS AND CONTRACTORS, AMERICAN LODGING AND HOTEL ASSOCIATION,

*Intervenors-Defendants-Appellants.*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ........................................................................iii

PRELIMINARY STATEMENT .................................................. 1

QUESTIONS PRESENTED....................................................... 3

STATEMENT OF THE CASE .................................................. 4

    A.   The Fair Labor Standards Act ................................. 4

    B.   The Joint-Employment Doctrine................................ 8

    C.   The Final Rule................................................... 12

    D.   Procedural Background .......................................... 16

    E.   The Superseding Rulemaking ................................. 18

STANDARD OF REVIEW AND SUMMARY OF ARGUMENT ........... 20

ARGUMENT ...................................................................... 23

POINT I

THIS CASE SATISFIES THE REQUIREMENTS OF ARTICLE III.................... 23

    A.   The States Have Suffered Cognizable Injuries-in-Fact. ........ 23

    B.   The States Are Within the Applicable Zone of Interests. ...... 31

    C.   The States' Claims Are Ripe for Review. ................................ 34

POINT II

THE RULE VIOLATES THE ADMINISTRATIVE PROCEDURE ACT................ 37

    A.   The Rule Is Contrary to Law.................................... 37

**Page**

1. The Rule's sole reliance on the definition of "employer" and abandonment of the "suffer and permit" standard radically narrow the joint-employer inquiry in conflict with the statute's plain language and history. ....................................................... 40

2. The Rule's separate standard for identifying joint employers improperly restricts Congress's broad standard for identifying any employer. ........................... 47

3. The Rule's actual-control test for joint employers limits the scope of the Act in ways that Congress specifically rejected. ........................................... 51

4. The Rule's categorical rejection of certain important economic factors impermissibly limits the joint-employer inquiry. ................................................ 58

B. The Rule Is Arbitrary and Capricious. .................................. 60

1. The Rule fails to provide a reasoned explanation for the Department of Labor's change in position. ............... 61

2. The Rule fails to meaningfully consider the extensive harms to workers that it will cause. ............... 63

3. The Rule failed to consider its creation of conflict between two statutes that Congress intended to mirror each other with respect to joint employers. .......... 66

CONCLUSION .......................................................................... 68

# TABLE OF AUTHORITIES

**Cases**                                                        **Page(s)**

*Air All. Houston v. EPA*,
  906 F.3d 1049 (D.C. Cir. 2018) ....................................................... 23, 24

*Alcaraz v. Block*,
  746 F.2d 593 (9th Cir. 1984) ................................................................ 35

*American Civil Liberties Union v. FCC*,
  823 F.2d 1554 (D.C. Cir. 1987) ............................................................ 34

*American Tort Reform Ass'n v. OSHA*,
  738 F.3d 387 (D.C. Cir. 2013) .............................................................. 34

*Antenor v. D & S Farms*,
  88 F.3d 925 (11th Cir. 1996) ................................................................ 51

*Appalachian Power Co. v. EPA*,
  208 F.3d 1015 (D.C. Cir. 2000) ............................................................ 35

*Bank of Am. Corp. v. City of Miami*,
  137 S. Ct. 1296 (2017) .......................................................................... 33

*Barfield v. New York City Health & Hosps. Corp.*,
  537 F.3d 132 (2d Cir. 2008) ................................................................. 46

*Baystate Alt. Staffing, Inc. v. Herman*,
  163 F.3d 668 (1st Cir. 1998) ................................................................... 5

*Bonnette v. California Health and Welfare Agency*,
  704 F.2d 1465 (9th Cir. 1983) ................................................. 13, 14, 55

*Cablevision Sys. Corp. v. FCC*,
  649 F.3d 695 (D.C. Cir. 2011) ............................................................. 36

*Catskill Mountains Chapter of Trout Unlimited, Inc. v. City
  of New York*,
  451 F.3d 77 (2d Cir. 2006) ................................................................... 57

| Cases | Page(s) |
|---|---|

*Catskill Mountains Chapter of Trout Unlimited, Inc. v. EPA*,
  846 F.3d 492 (2d Cir. 2017) .................................................. 40

*Christopher v. SmithKline Beecham Corp.*,
  567 U.S. 142 (2012) ............................................................. 49

*Citizens for Responsibility & Ethics in Wash. v. Trump*,
  939 F.3d 131 (2d Cir. 2019) ................................................ 32

*Citizens to Pres. Overton Park, Inc. v. Volpe*,
  401 U.S. 402 (1971) ............................................................. 67

*Clarke v. Securities Indus. Ass'n*,
  479 U.S. 388 (1987) ............................................................. 32

*Department of Commerce v. New York*,
  139 S. Ct. 2551 (2019) ........................................................ 30

*Department of Homeland Sec. v. Regents of Univ. of Cal.*,
  140 S. Ct. 1891 (2020) ........................................................ 60

*Encino Motorcars, LLC v. Navarro*,
  136 S. Ct. 2117 (2016) ................................................... 44, 62

*Expressions Hair Design v. Schneiderman*,
  137 S. Ct. 1144 (2017) ........................................................ 31

*Falk v. Brennan*,
  414 U.S. 190 (1973) ........................................................ 53, 54

*FCC v. Fox Television Stations, Inc.*,
  556 U.S. 502 (2009) ............................................................. 61

*Federal Defs. of New York, Inc. v. Federal Bureau of Prisons*,
  954 F.3d 118 (2d Cir. 2020) ................................................ 33

*In re Enterprise Rent-A-Car Wage & Hour Emp't Practices Litig.*,
  683 F.3d 462 (3d Cir. 2012) ................................................ 56

**Cases**                                                           **Page(s)**

*Irizarry v. Catsimatidis,*
722 F.3d 99 (2d Cir. 2013) .................................................. 42

*Kerbes v. Raceway Assocs., LLC,*
2011 IL App (1st) 110318 (Ill. App. Ct. 2011)..................... 28

*Layton v. DHL Express (USA), Inc.,*
686 F.3d 1172 (11th Cir. 2012)..................................... 46, 58

*Lexmark Int'l v. Static Control Components,*
572 U.S. 118 (2014) ............................................................ 32

*Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak,*
567 U.S. 209 (2012) ............................................................ 32

*Mingo Logan Coal Co. v. EPA,*
829 F.3d 710 (D.C. Cir. 2016) ........................................... 63

*Mitchell v. City of New York,*
841 F.3d 72 (2d Cir. 2016) ................................................. 20

*Motor Vehicles Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.,*
463 U.S. 29 (1983) ............................................. 60, 63, 65

*Nationwide Mut. Ins. Co. v. Darden,*
503 U.S. 318 (1992) ............................................. 28, 42, 51

*New York v. United States Dep't of Homeland Sec.,*
969 F.3d 42 (2d Cir. 2020) ............................................ 23, 43

*People v. Sheffield Farms-Slawson-Decker Co.,*
225 N.Y. 25 (1918)................................................................ 6

*Public Citizen, Inc. v. Mineta,*
340 F.3d 39 (2d Cir. 2003) ................................................. 63

*Public Citizen v. Federal Motor Carrier Safety Admin.,*
374 F.3d 1209 (D.C. Cir. 2004) .......................................... 65

**Cases**                                                      **Page(s)**

*Reno v. Flores,*
   507 U.S. 292 (1993) ............................................................... 36

*Rutherford Food Corp. v. McComb,*
   331 U.S. 722 (1947) ...................................................... passim

*Salinas v. Commercial Interiors, Inc.,*
   848 F.3d 125 (4th Cir. 2017) ...................................... passim

*Sekhar v. United States,*
   570 U.S. 729 (2013) ............................................................... 43

*Skidmore v. Swift & Co.,*
   323 U.S. 134 (1944) ............................................................... 40

*Texas v. United States,*
   787 F.3d 733 (5th Cir. 2015) ......................................... 29, 30

*Texas v. United States,*
   809 F.3d 134 (5th Cir. 2015) .............................................. 33

*Tony & Susan Alamo Found. v. Secretary of Labor,*
   471 U.S. 290 (1985) ................................................................. 6

*Torres-Lopez v. May,*
   111 F.3d 633 (9th Cir. 1997) ......................................... 46, 48

*Walling v. Portland Terminal Co.,*
   330 U.S. 148 (1947) ............................................................... 38

*Zheng v. Liberty Apparel Co. Inc.,*
   355 F.3d 61 (2d Cir. 2003) ........................................... passim

**Federal Statutes**

5 U.S.C. § 706 ................................................................... 37, 61

**Federal Statutes**                                             **Page(s)**

29 U.S.C.
§ 203................................................................. passim
§ 206.................................................................... 4
§ 207.................................................................... 4
§ 218................................................................... 33
§ 1802................................................................... 9

**Federal Regulations**

29 C.F.R. § 500.20....................................... 10, 66, 67

Rescission of Joint Employer Status Under the Fair Labor
    Standards Act, 86 Fed. Reg. 14,038 (Mar. 12, 2021).................. 18, 19

**Miscellaneous Authorities**

Bruce Goldstein et al., *Enforcing Fair Labor Standards in
    the Modern American Sweatshop: Rediscovering the
    Statutory Definition of Employment*, 46 U.C.L.A. L. Rev.
    983 (1999) .......................................................... 44

Kati L. Griffith, *The Fair Labor Standards Act at 80:
    Everything Old Is New Again*, 104 Cornell L. Rev. 557 (2019)............ 6

Keith Cunningham-Parmeter, *From Amazon to Uber:
    Defining Employment in the Modern Economy*, 96 B.U. L.
    Rev. 1673, 1694 (2016)........................................ 44

Restatement (Second) of Agency (Mar. 2021 update) (Westlaw) ........... 52

United States Department of Labor, Wage & Hour Division,
    *Administrator Interpretations Letter - Fair Labor
    Standards Act* (last visited Apr. 16, 2021),
    https://bit.ly/32kpoHl ........................................... 11

## PRELIMINARY STATEMENT

For eighty years, the federal courts and the U.S. Department of Labor (DOL) have recognized that the wage-and-hour protections of the Fair Labor Standards Act (FLSA) extend not just to employees' direct employers, but also to so-called "joint employers" that benefit from such employees' work and have practical influence over the employees' working conditions. Consistent with FLSA's broad remedial goals, the test for determining joint-employment status established by both the courts and DOL has long looked beyond the traditional common-law factors of formal control (such as the power to hire and fire and to supervise work schedules) to encompass a much broader range of entities that share responsibility for ensuring that workers are paid the minimum required by federal law.

In the Rule at issue here, DOL broke from this decades-long tradition to promulgate a much narrower understanding of joint-employer status. The U.S. District Court for the Southern District of New York (Woods, J.) held that DOL's narrower interpretation was contrary to FLSA and also arbitrary and capricious. This Court should affirm.

The district court correctly concluded that it had jurisdiction over the claims of the state plaintiffs here. Extensive documentary evidence that defendants never contested established that the States would suffer increased enforcement and administrative costs under the Rule. These pocketbook injuries easily satisfy Article III.

The district court also correctly held that the Rule was contrary to law. As courts (including this Court) have repeatedly held, FLSA's plain text extends beyond the common-law understanding of employer, which focused rigidly on formal control factors, and requires a holistic inquiry into a particular relationship that takes into account its economic realities. The Rule conflicts with FLSA by narrowing its interpretation of joint employment in a way that unduly restricts FLSA's broad remedial scope, and by excluding certain indicia of joint-employer status that have long been considered relevant by the courts and by DOL.

Finally, the district court correctly found that the Rule was arbitrary and capricious. Among other errors, DOL failed to explain its abrupt change from eighty years of prior guidance and did not consider the costs of the Rule on the workers whom FLSA is designed to protect.

DOL itself has acknowledged the serious errors in the Rule. In a notice published in March 2021, DOL advised that it was considering rescinding the Rule in part because of the same errors identified by the district court. The comment period closed on this proposed rescission just a few days ago, on April 12, 2021, and DOL's finalization of the rescission may very well moot out this appeal. To the extent that the controversy over this Rule remains live, however, this Court should affirm the district court's decision below.

## QUESTIONS PRESENTED

1.     Whether the plaintiff States have standing and are within the zone of interests protected by FLSA and the Administrative Procedure Act because the Rule imposes direct regulatory enforcement and administrative costs on the States.

2.     Whether the Rule is contrary to law under the Administrative Procedure Act because it (a) separates FLSA's interlocking definitions for "employer," "employee," and "employ"; (b) applies two different employment standards in place of the single broad standard imposed by Congress; (c) applies a narrow actual-control test to discern joint-employer

liability; and (d) categorically forbids consideration of certain important factors in determining joint-employer liability.

3. Whether the Rule is arbitrary and capricious under the Administrative Procedure Act because it does not (a) reasonably explain DOL's change of position; (b) rationally assess the harms that the Rule will inflict on workers; or (c) consider that it requires DOL to apply conflicting joint-employer standards under statutes that are supposed to have one uniform standard.

## STATEMENT OF THE CASE

### A.    The Fair Labor Standards Act

Congress enacted the Fair Labor Standards Act in 1938 to eradicate the "evils and dangers resulting from wages too low to buy the bare necessities of life and from long hours of work injurious to health." (Joint Appendix (J.A.) 603.) The statute requires "[e]very employer" to pay each "employee[]" at least the federal minimum wage for each hour worked plus overtime for each hour worked over forty hours in a workweek. 29 U.S.C. §§ 206(a), 207(a).

Consistent with FLSA's "remedial and humanitarian purpose," Congress adopted interlocking "definitions of 'employ,' 'employee,' and

4

'employer' that brought a broad swath of workers within the statute's protection." *Salinas v. Commercial Interiors, Inc.*, 848 F.3d 125, 133 (4th Cir. 2017) (quotation marks omitted). Under FLSA, "employer" is defined as "any person acting directly or indirectly in the interest of an employer in relation to an employee." 29 U.S.C. § 203(d). An "'employee' means any individual employed by an employer." *Id.* § 203(e)(1). And "'[e]mploy' includes to suffer or permit to work." *Id.* § 203(g). These interrelated definitions were deliberately intended to go beyond the pre-existing common law's narrower understanding of the employer-employee relationship, and thus "to require [FLSA's] application to many persons and working relationships, which prior to th[e] Act, were not deemed to fall within an employer-employee category." *Rutherford Food Corp. v. McComb*, 331 U.S. 722, 729 (1947) (quotation marks omitted); *Baystate Alt. Staffing, Inc. v. Herman*, 163 F.3d 668, 675 (1st Cir. 1998) ("remedial purposes of the FLSA require courts to define 'employer' more broadly than the term would be interpreted in traditional common law applications" (quotation marks omitted)). Courts have repeatedly recognized that FLSA is to be "construed . . . liberally to apply to the furthest reaches

5

consistent with congressional direction." *Tony & Susan Alamo Found. v. Secretary of Labor*, 471 U.S. 290, 296 (1985) (quotation marks omitted).

The breadth of FLSA's interconnected definitions was intended in part to extend liability to joint employers and reduce the ability of businesses to use intermediaries or technical changes in their corporate form to avoid their responsibility to pay minimum wages. *See* Kati L. Griffith, *The Fair Labor Standards Act at 80: Everything Old Is New Again*, 104 Cornell L. Rev. 557, 571–73 (2019). "[A] central theme . . . of the FLSA's legislative history" was congressional intent "to cover businesses [that] allow work to be done on their behalf and" have the power to "prevent wage and hour abuses, regardless of indirect business relationships and business formalities." *Id.* at 571. For example, FLSA's broad definition of "employ" was derived from the child-labor statutes of thirty-two states and the District of Columbia. *Rutherford*, 331 U.S. at 728 n.7. The States used the broad "suffer or permit to work" standard to ensure that businesses "may not escape" the commands of state child-labor laws by ostensibly delegating certain employer-related duties to others. *People v. Sheffield Farms-Slawson-Decker Co.*, 225 N.Y. 25, 29 (1918).

This concern about improper evasion of liability appears repeatedly in FLSA's legislative history. In joint hearings on the bill, Rep. William Fitzgerald feared the bill might push "unfair manufacturers" to "extend the home work racket in this country by taking work out of the factory and putting it into the homes at miserable wages." (J.A. 596.) Then-Assistant Attorney General Robert H. Jackson responded that such "home work" would be swept up by the bill, explaining that "the factory which sends out and makes use of people in their homes are [sic] not exempted just because they are using premises they do not pay any rent for." (J.A. 596; *see also* J.A. 587) (statement of Sen. Robert La Follette) (expressing concern over businesses exploiting loopholes, such as "a commission arrangement, [to] take themselves out from under the terms of the bill").)

**B.    The Joint-Employment Doctrine**

Both the Supreme Court and "Congress repeatedly [have] reaffirmed that the FLSA's definitions of 'employ,' 'employee,' and 'employer' dictate that two or more entities can constitute 'joint employers' for purposes of the FLSA." *Salinas*, 848 F.3d at 135. A broad holistic inquiry has always informed the question of whether two employers should be considered "joint employers" for FLSA purposes. For example, the Supreme Court's seminal decision in *Rutherford* relied not on "isolated factors but rather upon the circumstances of the whole activity" to determine that workers employed by an intermediary were also employees of the slaughterhouse that contracted with the intermediary. *Rutherford*, 331 U.S. at 728-30.

Consistent with *Rutherford*, this Court has held that the joint employer determination is "to be based on the circumstances of the whole activity viewed in light of economic reality." *Zheng v. Liberty Apparel Co. Inc.*, 355 F.3d 61, 71 (2d Cir. 2003) (citations omitted) (quotation marks omitted). In particular, the traditional common-law factors, which look to traditional elements of control, are not dispositive. *Id.* at 69. Thus, "an entity can be a joint employer under the FLSA even when it does not hire

and fire its joint employees, directly dictate their hours, or pay them." *Id.* at 70. The relevant question is whether "an entity has functional control over workers even in the absence of the formal control" measured by the common law. *Id.* at 72.

To implement this flexible understanding of "joint employer" under FLSA, the federal DOL has issued pertinent guidance since 1939. (Special Appendix (S.P.A.) 91-97.) DOL later formally codified the joint-employment standard in 1958, making clear that it relied on the inter-related definitions of "employ," "employee," and "employer" from FLSA. (S.P.A. 98-99.) In that standard, DOL explained: "A single individual may stand in the relation of an employee to two or more employers at the same time under the Fair Labor Standards Act of 1938." (S.P.A. 99.) Whether two entities are joint employers "depends upon all the facts in the particular case." (S.P.A. 99.)

DOL also has issued regulations regarding the scope of joint employment under the Migrant and Seasonal Agricultural Worker Protection Act (MSPA). In MSPA, Congress did not define the terms "employer" or "employee," and explicitly stated that the term "'employ' has the meaning given such term" under FLSA, 29 U.S.C. § 1802(5). DOL's

MSPA regulations further incorporate FLSA's definitions of "employee" and "employer" as part of ensuring that the scope of joint-employer liability under MSPA mirrors the scope of joint-employer liability under FLSA. 29 C.F.R. § 500.20(h)(1)-(3); *see id.* § 500.20(h)(5) ("definition of the term employ includes the joint-employment principles applicable under the [FLSA]"). And the regulations explain that "[i]n determining whether or not an employment relationship exists between the agricultural employer/association and the agricultural worker, the ultimate question to be determined is the economic reality—whether the worker is so economically dependent upon the agricultural employer/association as to be considered its employee." *Id.* § 500.20(h)(5).

DOL issued new guidance to clarify the "definition of 'joint employment' under the MSPA" in 1997. (S.P.A. 100-125.) DOL emphasized that "the courts have given an expansive interpretation to the statutory definition of employ under the FLSA" and have rejected "the traditional common law 'right to control' test[.]" (S.P.A. 117-118.) And DOL noted that "Congress enacted th[e] express incorporation of the FLSA definition of employ with the deliberate intention of adopting the FLSA case law defining employment and joint employment." (S.P.A. 118.)

10

In 2014, DOL issued guidance regarding joint employment under FLSA, highlighting that the definitions of "employee," "employ," and "employer" in FLSA "are exceedingly broad."[1] (S.P.A. 127.) DOL explained that "[w]hether an entity is an employer under the FLSA is governed by longstanding case law from the U.S. Supreme Court and other federal appellate courts interpreting the Act," and depends "upon the circumstances of the whole activity." (S.P.A. 127 (quoting *Rutherford*, 331 U.S. at 730).)

In 2016, DOL issued guidance reaffirming its longstanding reliance on judicial precedent, reflecting that "[t]he growing variety and number of business models and labor arrangements have made joint employment more common."[2] (S.P.A. 139.) Relying on this Court's decision in *Zheng*, 355 F.3d 61, among other cases, DOL explained that the "joint employment analysis must be an economic realities analysis and cannot focus only on control." (S.P.A. 144.) "The particular economic realities factors

---

[1] The 2014 guidance was later withdrawn on March 10, 2020. *See* U.S. Dep't of Labor, Wage & Hour Div., *Administrator Interpretations Letter - Fair Labor Standards Act*, at n.** (last visited Apr. 16, 2021), https://bit.ly/32kpoHl.

[2] The 2016 guidance was later withdrawn on June 7, 2017. *See* U.S. Dep't of Labor, *supra*, at n*.

relied upon differ somewhat depending on the court, and courts routinely note that other additional relevant factors may be considered, but regardless, it is not a control test." (S.P.A. 144.)

## C. The Final Rule

The Final Rule here significantly departs from DOL's decades-long interpretation of the joint-employer standard and considerably narrows the circumstances under which a joint-employment relationship will be found. Joint Employer Status Under the Fair Labor Standards Act, 85 Fed. Reg. 2820 (Jan. 16, 2020) (to be codified at 29 C.F.R. §§ 791.1-791.3) ("Final Rule" or "Rule") (S.P.A. 191-258). In issuing the Rule, DOL claimed that its own prior regulations did "not provide adequate guidance for the most common joint employer scenario under the Act—where an employer suffers, permits, or otherwise employs an employee to work, and another person simultaneously benefits from that work."[3] (S.P.A. 192.)

_____

[3] Some courts refer to this arrangement—i.e., where an employee has a direct employment relationship with one employer, but a different entity also benefits—as "vertical" joint employment. (S.P.A. 198.) By contrast, "horizontal" joint employment exists where an employee has a direct employment relationship with two or more employers who are sufficiently related to deem them to be acting jointly. (S.P.A. 32 n.2.) This appeal concerns only "vertical" joint employment. (S.P.A. 34.)

Deviating from the holistic inquiry that has governed the joint-employer doctrine for the last eighty years, the Rule provides that only four factors are now relevant—namely, whether the putative employer:

> (i) Hires or fires the employee;
>
> (ii) Supervises and controls the employee's work schedule or conditions of employment to a substantial degree;
>
> (iii) Determines the employee's rate and method of payment; and
>
> (iv) Maintains the employee's employment records.

(S.P.A. 246.) These factors all address whether the putative employer directly controls the employee.

The Rule purports to adopt this test from the Ninth Circuit's decision in *Bonnette v. California Health and Welfare Agency*, 704 F.2d 1465, 1470 (9th Cir. 1983), but it is in fact significantly narrower. For example, the first *Bonnette* factor looks to whether a potential joint employer has the power to hire or fire the employee, regardless of whether that power actually is exercised. *Id.* But the Rule narrows this factor to "consider only whether the potential joint employer hires or fires the employee, rather than whether" it has authority to do so. (S.P.A. 205.) In a similar vein, the Rule requires that the "potential joint employer

13

must *actually exercise*—directly or indirectly—one or more of these indicia of control to be jointly liable under the Act," and that the mere power to exercise these indicia of control is not enough. (S.P.A. 246-247 (emphasis added).) And contrary to *Bonnette*, which emphasizes that all of the economic realities must be considered, 704 F.2d at 1469, the Rule permits consideration of other factors "only if they are indicia of whether the potential joint employer exercises significant control over the terms and conditions of the employee's work" (S.P.A. 247).

The Rule also changes pre-existing law by categorically excluding certain factors as irrelevant, such as those "used to assess economic dependence," including: whether the employee "is in a specialty job or a job that otherwise requires special skill"; "has the opportunity for profit or loss"; "invests in equipment or materials"; and "[t]he number of contractual relationships . . . that the potential joint employer has entered into to receive similar services." (S.P.A. 247.) The Rule also prohibits the consideration of whether the potential joint employer uses a franchise or brand and supply model, and of certain contractual terms between businesses—such as mandating compliance with legal obliga- tions, establishing policies, or requiring training. (S.P.A. 247.) The Rule

14

also prohibits consideration of other business arrangements, such as providing a sample employee handbook, allowing a business to operate on the premises, and participating jointly in a health or retirement plan, among others. (S.P.A. 248.) Indeed, the Rule's preamble explains that:

> [b]usinesses should not be discouraged from entering into and enforcing against other businesses such contractual agreements out of fear that encouraging compliance with health, safety, or legal obligations among their suppliers, vendors, sub-contractors, or franchisees will cause them to be considered joint employers of the employees of these other businesses.

(S.P.A. 221.)

In the Rule, DOL "acknowledges that there may be transfers from employees to employers." (S.P.A. 193.) But DOL claimed that it "lacks the data needed to calculate the potential amount or frequency of these transfers." (S.P.A. 193.) DOL also acknowledged that "the cost-savings attributable to this rule have not been quantified." (S.P.A. 238.)

15

## D.    Procedural Background

In February 2020, seventeen states and the District of Columbia ("States" or "state plaintiffs") sued to invalidate and enjoin enforcement of the Rule under the Administrative Procedure Act (APA). (J.A. 28-82.) The complaint alleged that the Rule is (a) not in accordance with law because it is contrary to FLSA and (b) arbitrary and capricious. (J.A. 76-77.) Defendants moved to dismiss on standing grounds. On June 1, 2020, the U.S. District Court of the Southern District of New York (Woods, J.) denied the motion, holding that the States had plausibly alleged that the Rule will increase their administrative and enforcement costs under state-law analogues of FLSA and reduce their tax revenue. (S.P.A. 1-26.) The court also held that the States had satisfied the requirements for prudential standing. (S.P.A. 24.) Following the district court's decision, five trade organizations intervened as defendants.

On September 8, 2020, the district court issued a detailed opinion granting in part the States' motion for summary judgment and vacating the Rule's novel interpretation of vertical joint-employer liability. (S.P.A. 27-88.) The court reaffirmed its holding that the States had standing because the Rule would increase their administrative and enforcement

16

costs, relying on the extensive documentary evidence that the States had submitted to establish these costs. (S.P.A. 43-48.) The court further held that the case was ripe and that the States' claims satisfied the zone-of-interests test. (S.P.A. 52-55.)

On the merits, the court concluded that the Rule was contrary to law because it conflicted with FLSA, prior DOL interpretations of FLSA and MSPA, and judicial precedent. (S.P.A. 55-81.) The court held that DOL improperly relied on FLSA's definition of "employer" as the sole textual basis for joint-employment liability. As the court explained, the Rule thus improperly untethered the definition of "employer" from the definitions of "employee" and "employ," and abandoned FLSA's long-standing "suffer or permit to work" standard for joint employers. The court further determined that the Rule contravened the statute by applying two different employment tests depending on whether an entity was purportedly an individual's direct employer or joint employer. (S.P.A. 55-73.) And the court found additional flaws as well, holding that the Rule improperly "adopts a control-based test" and unduly limited the factors DOL is permitted to consider in the joint-employer inquiry. (S.P.A. 73-81.)

17

The court held that the Rule was also arbitrary and capricious for at least three reasons. (S.P.A. 81-86.) First, DOL had not adequately explained the Rule's "volte-face" from the agency's prior interpretations of joint-employer liability. (S.P.A. 81-83.) Second, DOL failed to consider the conflict between the Rule and MSPA regulations. (S.P.A. 83.) Third, the Rule did not adequately consider its cost to workers despite conceding that it might reduce employees' ability to collect back wages. (S.P.A. 83-86.)

## E.   The Superseding Rulemaking

On March 12, 2021, DOL issued a notice of proposed rulemaking, proposing to rescind the Rule in its entirety. Rescission of Joint Employer Status Under the Fair Labor Standards Act, 86 Fed. Reg. 14,038 (Mar. 12, 2021). The proposed rescission would remove the regulations established by the Rule. *Id.* at 14,038. Comments on the proposal were due April 12, 2021. *Id.*

In explaining the need for rescission, DOL acknowledged that "[t]he statutory analysis and test for vertical joint employment set forth in the Joint Employer Rule is different from the analyses and tests applied by every court to have considered joint employer questions prior to the Rule's issuance, as well as [DOL's] previous enforcement approach." *Id.*

18

at 14,042. In particular, DOL explained that "while tests differ among the circuit courts of appeals, all courts consistently use a totality-of-the-circumstances economic realities approach to determine the scope of joint employment under FLSA, rather than limiting the focus exclusively to control," as this Rule does. *Id.* at 14,043. DOL also expressed its "concern that the Rule did not adequately account for inconsistencies with its previous guidance" and "may not have adequately considered the costs for employees." *Id.* at 14,044-45.

Given the superseding rulemaking, the federal defendants filed a motion, with plaintiffs' consent, to hold this appeal in abeyance for six months while DOL reviewed and considered comments concerning the proposed rule. The Court denied the motion.

## STANDARD OF REVIEW AND
## SUMMARY OF ARGUMENT

This Court reviews a grant of summary judgment de novo. *Mitchell v. City of New York*, 841 F.3d 72, 77 (2d Cir. 2016). Here, the district court properly granted summary judgment for plaintiffs and vacated the Rule. This Court should affirm.

I.    The plaintiff States have standing because the Rule will directly and predictably impose enforcement and administrative costs on them. The Rule will make it significantly harder to establish joint-employer status under federal law, thereby forcing plaintiff States to expend resources to increase state enforcement efforts against wage-and-hour violations. And because many States' wage-and-hour laws are intertwined with FLSA's standards, plaintiffs will incur administrative costs to develop new state standards that do not rely on the Rule's radically narrow joint-employment test.

Plaintiffs also easily satisfy the lenient zone-of-interests test given the APA's generous review provisions and FLSA's explicit recognition and preservation of the States' traditional role in pursuing enforcement actions for labor-law violations under state and federal law. And plaintiffs' claims are ripe for review because the Rule's new interpretation of joint-

20

employer status marks the culmination of the agency's decision-making process and has immediate legal effects.

II. The Rule violates the APA because it is contrary to law and arbitrary and capricious.

A. The Rule contravenes FLSA in multiple ways. First, to impose the Rule's exceedingly narrow test for joint employment, DOL improperly untethered the statute's interconnected definitions from each other and abandoned FLSA's long-standing and broad "suffer or permit to work" standard for determining FLSA liability. This interpretation flatly contradicts FLSA's plain terms, Congress's fundamental purpose to apply the "suffer or permit to work" standard to joint employers, and eighty years of judicial precedent.

Second, the Rule improperly imposes two distinct employment tests—one for direct employers and one for joint employers—in place of the single employment inquiry that Congress enacted for all putative employers. Third, the Rule further defies the statute, Congress's intent, and this Court's binding precedents by both requiring that an entity actually exercise control over a worker to be deemed a joint employer and categorically precluding consideration of certain important factors in

conducting the joint-employment inquiry. The district court thus properly declined to accord the Rule deference and correctly vacated it.

B.     The Rule is also arbitrary and capricious for multiple reasons, as the district court correctly found. For example, DOL failed to address or explain its drastic departure from its own prior interpretations of FLSA. DOL also irrationally ignored the severe harms that the Rule will impose on workers. And DOL arbitrarily failed to consider that the Rule triggers conflict between the application of FLSA and MSPA to putative joint employers, despite Congress's intention to apply a uniform joint-employment standard under both statutes.

# ARGUMENT

## POINT I

### THIS CASE SATISFIES THE REQUIREMENTS OF ARTICLE III

## A.    The States Have Suffered Cognizable Injuries-in-Fact.

The district court correctly concluded that the States have standing due to the Final Rule's predictable imposition of both enforcement and administrative costs. (S.P.A. 19-20.) The States established the fact of these costs through detailed declarations that defendants have not contested. And multiple precedents recognize the relevance of these costs to support the States' standing.

*1. Enforcement Costs.* When a federal regulation forces a State to expend resources to mitigate harm that would have been prevented but for the regulation, the State sustains "precisely the kind of pocketbook injury" that confers standing. *Air All. Houston v. EPA*, 906 F.3d 1049, 1059-60 (D.C. Cir. 2018) (quotation marks omitted). Thus, in *Department of Homeland Security*, this Court held that States had standing to challenge a rule that would deter immigrants from obtaining certain public benefits and therefore result in an "overall increase in healthcare costs that will be borne by public hospitals." *New York v. United States*

*Dep't of Homeland Sec.*, 969 F.3d 42, 60 (2d Cir. 2020). Likewise, in *Air Alliance*, the D.C. Circuit held that States had standing to challenge an EPA rule that weakened safety standards for industrial facilities in light of the higher costs that the States would have to incur to respond to and investigate industrial accidents. 906 F.3d at 1059-60.

The district court correctly found standing on similar grounds here. The Rule indisputably makes it harder to establish joint-employer status and thus removes an important source of protection for workers. As the Rule itself explains, its new standard "may reduce the number of businesses currently found to be joint employers from which employees may be able to collect back wages due to them under the Act," which, "in turn, may reduce the amount of back wages that employees are able to collect when their employer does not comply with the Act." (S.P.A. 237.) Empirical evidence the States presented below confirmed that the Rule's less protective joint-employer standard will lead to more wage-and-hour violations as businesses adapt their operations to take advantage of the features that the Rule now categorically says will not count for joint-employer status. (*E.g.*, J.A. 87-91.)

States will be forced to step up their own efforts to make up for this withdrawal of federal protection. For example, Vermont has estimated that it would have to increase its staffing dedicated to wage-and-hour violations "by approximately 50%" to handle the increase in cases as workers "turn from USDOL to [Vermont's Department of Labor] to pursue wage theft or other wage-related claims." (J.A. 221.) Washington estimates needing to spend "$345,000-$460,000 to manage any increase in mandatory investigations" from the withdrawal of federal protection in this area. (J.A. 242.) Other States similarly explained below that they "will effectively have to fill in the gap in federal enforcement created by the Final Rule." (J.A. 106 (Delaware); *see also, e.g.*, J.A. 154 (Massachusetts will have to allocate "additional resources for enforcement of the state's wage and hour laws . . . to ensure workers receive their earned wages."); J.A. 163 ("Michigan will have to fill in the gap in federal enforcement created by the Final Rule if it is to ensure the current level of protections."); J.A. 199 ("The increased wage theft, worker misclassification, and payroll fraud flowing from the Final Rule will require increased enforcement efforts from [Rhode Island] and impose significant additional costs on [Rhode Island] to investigate alleged violations.").) Defendants contested none of

this evidence below, and the district court appropriately credited this evidence to conclude that the States would suffer increased enforcement costs as a result of the Rule. (S.P.A. 47-48.)

On appeal, defendants claim that these enforcement costs are "self-inflicted" because the Rule does not affirmatively "require[] states to change their own laws." (Br. for Defs.-Appellants (U.S. Br.) at 20; *see also* Br. for Intervenors-Defs.-Appellants (Intervenor Br.) at 23 (Rule "imposes no obligations whatsoever on the State Plaintiffs").) But this argument ignores that courts have repeatedly found standing based on States' reasonable responses to federal regulatory gaps, as the district court appropriately concluded here. (S.P.A. 48.) Put simply, States are not required to stand still when the withdrawal of federal protection predictably causes harm to their residents, and their expenditure of resources to maintain the status quo constitutes an injury-in-fact. For example, it would have been no answer in *Department of Homeland Security* to argue that the States could have declined to provide healthcare to the residents who were harmed by the rule at issue there. Likewise, *Air Alliance* recognized that States had a strong interest in responding to industrial accidents; it was immaterial that the rule at

26

issue there did not itself compel the States to (for example) provide emergency medical care or firefighting services after an explosion at a chemical plant. So too here: state plaintiffs have established that they routinely investigate and seek remedies for wage-and-hour violations, and that those enforcement efforts will have to be increased because of the Rule's weakening of the joint-employer standard. That direct proprietary injury satisfies Article III standing requirements.

*2. Administrative Costs.* The States have independently established injury-in-fact because the Final Rule will predictably impose administrative costs on them as well, as the district court correctly found. (S.P.A. 44-47.) The Rule itself acknowledges those costs, explaining that it "will impose direct costs on private businesses and state and local government entities by requiring them to review the new regulation." (S.P.A. 234.)

Here, the States' administrative costs follow from the intertwined nature of state laws and federal FLSA standards. Although FLSA does not preempt stricter state standards, as defendants admit (*see* U.S. Br. at 20), in practice many States have aligned their standards with federal DOL guidance, including on joint-employer status. (*See, e.g.*, J.A. 99-100, 113-114, 170.) Many state courts also rely on federal interpretations of

27

comparable FLSA provisions in the absence of state guidance to the contrary. *See, e.g.*, *Kerbes v. Raceway Assocs., LLC*, 2011 IL App (1st) 110318 ¶¶ 25-29 (Ill. App. Ct. 2011). That alignment made sense: at a time when federal DOL guidance properly reflected the "striking breadth" of FLSA, *Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318, 326 (1992), state adoption of federal FLSA standards served the States' own interest in providing broad protections to workers.

The Final Rule's abrupt weakening of the decades-old federal joint-employer standard forces States that do not wish to water down their own protections to take immediate action to disentangle their labor standards from FLSA. The States presented concrete evidence to explain the costs of this transition, which defendants never disputed. For example, Colorado estimates that the Rule will cause its Department of Labor and Employment to spend "several hundred hours of effort" to promulgate new rulemaking that will separate Colorado law from FLSA standards, issue new guidance to employers and employees that have come to rely on consistency between federal and state standards, and conduct new training for its staff. (J.A. 99-100.) The District of Columbia likewise attests that it will be forced to "retract current guidance that

28

incorporates prior FLSA jurisprudence into discussions of District legal standards for determining joint employment," implement new guidance, and generally "undertake efforts to educate the public about the newly distinct analyses for joint employment under the District law and federal law." (J.A. 113-114.) And Minnesota will be required to "develop guidance" and conduct "[a]n outreach and education campaign to inform . . . both employers and employees about the difference between the application of the joint employer doctrine under Minnesota and federal law." (J.A. 170.) The district court correctly concluded that "[t]his undisputed evidence is adequate to establish constitutional standing." (S.P.A. 45.)

Defendants again argue that these costs are "self-inflicted" because the Rule does not itself mandate these administrative costs. (Intervenor Br. at 23.) But the Fifth Circuit rejected a similar argument in finding that Texas had standing to challenge the federal Deferred Action for Parents of Americans (DAPA) program due to "the costs of issuing driver's licenses to DAPA beneficiaries." *Texas v. United States*, 787 F.3d 733, 748 (5th Cir. 2015). The Fifth Circuit found it immaterial that "Texas will be required neither to issue licenses nor to subsidize them" by the DAPA program itself. *Id.* Instead, Texas had suffered a cognizable injury because

29

it faced a "forced choice": either accept the increased costs of issuing drivers' licenses to DAPA beneficiaries or modify its own code to raise more revenue to offset those costs. *Id.* at 749. So too here: because many States chose to align their labor standards to federal guidance on joint-employer status at a time when federal standards provided greater protections, they will be forced either to surrender to the weaker standard imposed by the Rule or else to change their existing regulations to preserve their own laws' more protective scope.

Defendants similarly fault the States for choosing to link their own standards to FLSA and note that nothing in federal law compelled such a link. (U.S. Br. at 21.) But that argument is nonresponsive to the question of the States' standing. Whether or not States were compelled to do so, it is a fact that many of them did issue guidance assuming alignment between federal and state standards on joint employment— and understandably so, given that those standards were in fact in alignment for decades. The "predictable effect," *Department of Commerce v. New York*, 139 S. Ct. 2551, 2566 (2019), of the Final Rule's abrupt change to the federal standard—and concomitant disruption of the States' long-standing reliance on past federal interpretations of the joint-employer

30

standard—was thus to compel States to revisit their own guidance. Federal agencies cannot simply ignore reasonable compliance costs when they alter long-standing rules. Here, those costs further support the States' standing.[4]

## B. The States Are Within the Applicable Zone of Interests.

The district court also properly found that state plaintiffs were within the relevant zone of interests here. (S.P.A. 24-26, 54-55.) The zone-of-interests test is not "especially demanding," particularly where, as here, state plaintiffs have sued "under the generous review provisions of

---

[4] At the summary judgment stage, the district court declined to find that the States had standing on two alternative theories: a decrease in tax revenue and *parens patriae*. On tax revenue, the district court found that there was conflicting evidence about the effect of the Rule that precluded a ruling on summary judgment, but noted that defendants' evidence that the Rule would increase revenue was "paper thin." (S.P.A. 49-50.) And the court found it unnecessary to address *parens patriae* standing in light of the state plaintiffs' other cognizable injuries. (S.P.A. 21-23.) Although defendants argue against standing on both of these grounds on appeal (U.S. Br. at 22-33), this Court should decline to address those arguments when the district court did not definitively resolve them, and simply remand to the district court to address standing on both grounds in the first instance if it finds that enforcement and administrative costs are not sufficient. *Cf. Expressions Hair Design v. Schneiderman*, 137 S. Ct. 1144, 1151 (2017) ("[W]e are a court of review, not of first view" (quotation marks omitted).).

the APA." *Lexmark Int'l v. Static Control Components*, 572 U.S. 118, 130 (2014) (quotation marks omitted). The test "does not require the plaintiff to be an intended beneficiary of the law in question," but rather allows entities "who are injured" by an alleged violation of law to seek redress. *Citizens for Responsibility & Ethics in Wash. v. Trump*, 939 F.3d 131, 158 (2d Cir. 2019). "[T]he benefit of any doubt goes to the plaintiff." *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 225 (2012).

Here, for the reasons given above, the States have suffered injury because of the Final Rule. So long as injury-in-fact is satisfied, a plaintiff will not be found to be outside the relevant zone of interests unless "the plaintiff's interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit." *Clarke v. Securities Indus. Ass'n*, 479 U.S. 388, 399-400 & n.16 (1987) (quotation marks omitted).

State plaintiffs easily satisfy this lenient standard. As a threshold matter, the district court correctly recognized that the zone-of-interests test here must take into account the fact that the States "are suing under the APA" (S.P.A. 25), which explicitly authorizes lawsuits against agency

action like this one. Defendants are thus wrong to insist that the zone-of-interest analysis must focus on FLSA alone. (*E.g.*, U.S. Br. at 34.) As this Court has recently explained, "the APA context" matters in deciding whether a plaintiff falls in the relevant zone of interests, and calls for an especially broad inquiry into the effect of agency action on a particular litigant. *See Federal Defs. of New York, Inc. v. Federal Bureau of Prisons*, 954 F.3d 118, 128 (2d Cir. 2020).

The States' interests here are far more than "marginally related" to the subject matter of the Rule at issue here. The States are traditional regulators of their own labor markets. In that role, they not only promulgate their own guidelines for wage-and-hour requirements, but also pursue enforcement actions against noncompliant employers under both state and federal law. Indeed, FLSA expressly recognizes and preserves the States' historic role in regulating labor markets—an acknowledgment of the States' concrete interest in this field. *See* 29 U.S.C. § 218(a). The States' claims thus satisfy the zone-of-interests test. (S.P.A. 55.) *See, e.g.*, *Bank of Am. Corp. v. City of Miami*, 137 S. Ct. 1296, 1303 (2017) (city's financial injuries from "extra municipal expenses" fell within the Fair Housing Act's zone of interests); *Texas v. United States*, 809 F.3d 134, 163

(5th Cir. 2015) (States' role in administering public benefits put them in INA's zone of interests).

## C.     The States' Claims Are Ripe for Review.

Finally, intervenors (but not the federal defendants) argue that the States' claims are not ripe for review. The district court correctly rejected this argument. (S.P.A. 52-54.)

On appeal, intervenors base their ripeness argument on *American Tort Reform Association v. OSHA*, 738 F.3d 387 (D.C. Cir. 2013), which they claim does not permit challenges to a mere "interpretive rule" until the rule "'is relied upon or applied to support an agency action in a particular case'" (Intervenor Br. at 33). But the type of "interpretive rule" at issue in that case was an expression of the agency's view on preemption that everybody agreed had no legal effect whatsoever and was thus "much ado about nothing." *American Tort Reform Ass'n*, 738 F.3d at 392-93. By contrast, "if an agency issues a statement that is labeled an interpretative rule or a policy statement and it has all of the indicia of a final legislative rule, then the rule will be subject to review." *Id.* at 395. That distinction makes sense. "[T]here is no fixed principle that interpretive rules yet to be applied are not subject to judicial review." *American*

34

*Civil Liberties Union v. FCC*, 823 F.2d 1554, 1582 (D.C. Cir. 1987) (Edwards, J., concurring). Instead, the question is whether a particular rule is one "from which legal consequences will flow." *Appalachian Power Co. v. EPA*, 208 F.3d 1015, 1022 (D.C. Cir. 2000) (quotation marks omitted).

Here, the Final Rule itself acknowledges that its new interpretation of joint-employer status has legal effect in that it will guide federal DOL's enforcement efforts and also serve as an authority for "employers, employees, and courts to understand employers' obligations and employees' rights under [FLSA]." (S.P.A. 244.) Moreover, the Final Rule materially alters federal DOL's prior guidance on joint-employer status. It is well-established that rules that "effect a change in existing law or policy" are substantive rules that are subject to challenge under the APA. *Alcaraz v. Block*, 746 F.2d 593, 613 (9th Cir. 1984) (quotation marks omitted).

Intervenors do not challenge any of the other grounds the district court cited for finding the States' claims to be ripe, including the district court's conclusion that the agency's decision-making was final, that no further factual development would be required, and that any delay in review would cause hardship to the States. (S.P.A. 53.) Intervenors also do not contest the district court's finding that the States had "satisfied

35

the jurisdictional ripeness requirements." (S.P.A. 53.) Intervenors have accordingly waived any arguments on those points.

Intervenors' only remaining argument is that the States' claims should be seen as facial challenges subject to the "no set of circumstances" test of *Reno v. Flores*, 507 U.S. 292 (1993). (Intervenors Br. at 32.) But the States have never disputed that their APA claims here raise "purely legal questions" that are "not intertwined with how [federal DOL] might exercise its discretion in the future." *Cablevision Sys. Corp. v. FCC*, 649 F.3d 695, 715 (D.C. Cir. 2011) (quotation marks omitted). Indeed, the aspects of the Final Rule that the States have challenged—and that the district court correctly found to be invalid—"have been finally resolved and will not be at issue in individual enforcement proceedings." *Id.* Intervenors' suggestion that there may be some circumstances where the Final Rule could lawfully be applied thus simply ignores that the fatal legal errors identified by the district court mandated the Rule's vacatur.

## POINT II

### THE RULE VIOLATES THE ADMINISTRATIVE PROCEDURE ACT

Under the APA, courts must "hold unlawful and set aside agency action" when the challenged action is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). The district court properly concluded that the Rule violates the APA in all of these ways.

### A. The Rule Is Contrary to Law.

In FLSA, Congress utilized interlocking statutory definitions for the terms "employer," "employee," and "employ" that work "in harmony" (S.P.A. 168), to broadly apply the statute's wage-and-hour provisions to all entities that "suffer or permit" individuals to work, 29 U.S.C. § 203(g). *See id.* § 203(d), (e)(1). As DOL acknowledges, it is well-settled that two or more entities may satisfy the statute's definitions and thus employ the same individuals for purposes of FLSA. (U.S. Br. at 38.) Each such entity—commonly referred to as a "joint employer"—is jointly and severally liable for unpaid wages or other monies owed to the employees under FLSA. *See Salinas*, 848 F.3d at 134.

37

FLSA's far-reaching sweep to multiple potential employers is no accident. Congress purposefully used the trio of expansive statutory definitions to bring a "broad swath of workers within the statute's protection," *id.* at 133, and apply FLSA to "many persons and working relationships" that did not historically "fall within an employer-employee category," *Walling v. Portland Terminal Co.*, 330 U.S. 148, 150-51 (1947)—including entities that had previously used middlemen, subcontractors, or other business relationships to try to avoid legal responsibilities to workers (*see* S.P.A. 29, 32 n.2, 62, 64-65). To implement its sweeping protections, Congress applied the same broad definitional terms to *all* potential employers, with liability turning not on "isolated factors but rather upon the circumstances of the whole activity," *Rutherford*, 331 U.S. at 730. Thus, determining each entity's status as a potential employer under FLSA must be based on all of the surrounding economic realities rather than solely on the narrow concepts of formal control over employment conditions that have traditionally governed common-law employment standards. *See id.*; *Zheng*, 355 F.3d at 67-69.

The Rule radically breaks from FLSA's plain language, history, and purpose in imposing an unprecedented and exceedingly narrow test for

determining when certain entities are liable under FLSA as "joint employers." Under the Rule, whenever an individual has one direct employer for purposes of FLSA, no other entity can also be that individual's joint employer unless the entity actually exercises control over the individual's employment conditions. (S.P.A. 195-196, 199-202.) This novel and unduly limited joint-employment test turns solely on four actual-control factors listed in the Rule and other factors that likewise indicate "significant control" over the employee's work. (S.P.A. 195-196.) And the Rule categorically eliminates any consideration of many other factors that both courts and DOL have long considered to be relevant to whether a putative employer suffers or permits another to work, including an employee's economic dependence on the putative employer. (S.P.A. 196.)

The Rule flouts FLSA in multiple ways that independently and collectively render the Rule unlawful. In imposing the Rule's separate and extremely narrow test for determining joint employment, DOL improperly untethered the statute's interwoven definitions from each other, created two distinct employment tests in place of FLSA's single employment inquiry, and limited the employment inquiry for certain putative employers to the actual exercise of control over employment

conditions—an extraordinarily restrictive test that Congress never intended and that courts and DOL have repeatedly rejected. Because the Rule is unpersuasive, the district court properly declined to accord it any deference under *Skidmore* and correctly invalidated it as contrary to law.[5]

1. **The Rule's sole reliance on the definition of "employer" and abandonment of the "suffer and permit" standard radically narrow the joint-employer inquiry in conflict with the statute's plain language and history.**

In attempting to justify the Rule's restrictive actual-control test, DOL contends that when one entity is an individual's employer, FLSA's definition of "employer" becomes the "sole textual basis for determining" whether any other entity is also that individual's employer for purposes of FLSA liability. (S.P.A. 199.) Thus, under the Rule, FLSA's definitions of "employee" and "employ"—including, specifically, the broad "suffer or

---

[5] As defendants concede (U.S. Br. at 37-38), the Rule provides "general interpretations" to serve as "a practical guide to employers and employees as to how the Wage and Hour Division [of DOL] will seek to apply" FLSA (S.P.A. 181 (quotation and alteration marks omitted)), and thus is evaluated under the standards set forth in *Skidmore v. Swift & Co.*, 323 U.S. 134, 138 (1944). Under *Skidmore*, courts accord deference to an agency's interpretation to the extent the interpretation has any "power to persuade." *Catskill Mountains Chapter of Trout Unlimited, Inc. v. EPA*, 846 F.3d 492, 509 (2d Cir. 2017) (quotation marks omitted).

permit" language in the definition of "employ"—are irrelevant to determining whether any additional entity is also an employer under FLSA. (S.P.A. 199-201.) (*See* U.S. Br. at 38-40.) As the district court correctly concluded, the Rule's essential abandonment of the "suffer or permit" language for the joint-employer test contravenes the statute's plain language and history, Congress's intent, and more than eighty years of judicial and administrative precedent.

As defendants acknowledge (U.S. Br. at 39), the three definitional provisions plainly interlock with each other and must be read "in harmony" (S.P.A. 168). As the statute provides, the term "employer" "includes any person acting directly or indirectly in the interest of an employer in relation to an *employee*." 29 U.S.C. § 203(d) (emphasis added). The definition of "employee" "means any individual *employed* by an employer." *Id.* § 203(e)(1) (emphasis added). And the definition of "employ" "includes to suffer or permit to work." *Id.* § 203(g). When these three interrelated terms are properly read together, an employer-employee relationship exists under FLSA whenever an entity, through direct or indirect means, suffers or permits an individual to work—whether there ends up being one, two, or more such employers. *See Zheng* 355 F.3d at 66-70.

41

FLSA's extension of the concept of "employer" to all entities that "suffer or permit" another to work was one of the statute's key innovations—a deliberate expansion of the traditional common-law control test to ensure that FLSA's remedial purposes would apply broadly. By contrast, the Rule's divorcing of the term "employer" from the statute's "suffer or permit" standard improperly strips that term of the broad meaning that Congress specifically selected to govern all employer-employment relationships under FLSA. Without the "suffer or permit" language, FLSA's definitions of the terms "employer" and "employee" circularly cross-reference each other without providing guidance on the scope of the employer-employment relationship that triggers FLSA liability. *See* 29 U.S.C. § 203(d) (defining "employer" in reference to "employee"); *id.* § 203(e)(1) (defining "employee" in reference to "employer"); *see also Darden*, 503 U.S. at 323 (Employee Retirement Income Security Act's definition of "employee," which is the same as FLSA's definition of "employee," is "completely circular and explains nothing"); *Irizarry v. Catsimatidis*, 722 F.3d 99, 103 (2d Cir. 2013) (FLSA's definition of "employer," standing alone, "relies on the very word it seeks to define"). But Congress freighted these terms with a broad meaning by explicitly connecting them to the

42

"suffer or permit to work" standard—a term of art that already had an established meaning when Congress enacted FLSA.

As DOL does not dispute, the "suffer or permit to work" language originated in state child-labor statutes that broadly "imposed liability not only on businesses that directly employed children but also on businesses that used middlemen to illegally hire and supervise children." *Salinas*, 848 F.3d at 133 (quotation marks omitted). By incorporating this term of art to define the relevant employer-employee relationship under FLSA, Congress imposed FLSA liability on the same broad swath of potential employers that had been liable under the state child-labor laws. *See Sekhar v. United States*, 570 U.S. 729, 733 (2013) ("[I]f a word is obviously transplanted from another legal source, whether the common law or other legislation, it brings the old soil with it" (quotation marks and brackets omitted).); *Department of Homeland Sec.*, 969 F.3d at 70 (Congress's use of term with "settled meaning" incorporates that meaning into statute).

DOL thus improperly ignores not only FLSA's plain language but also its historical context, legislative history, and fundamental purpose in contending that the "suffer or permit to work" standard is entirely irrelevant to determining whether an employee has two (or more)

43

employers. Congress utilized the three interlocking provisions, and the "suffer or permit to work" standard in particular, to ensure that FLSA broadly covered entities that used subcontracts, middlemen, or other business arrangements to avoid responsibility for the abusive labor practices that pervaded garment sweatshops.[6] See *supra* at 4-7 (explaining legislative history). Congress thus used the "suffer or permit to work" standard to expand FLSA to cover joint employers, i.e., to cover *both* the manufacturers whose garments workers were sewing and the subcontractors, middlemen, or other entities that directly employed those workers in sweatshops. (*See* S.P.A. 63-64.) Rendering the "suffer or permit to work" standard irrelevant to the joint-employment analysis, as the Rule does, defies Congress's intent to use that broad standard to expand FLSA liability to joint employers.[7]

---

[6] *See* Keith Cunningham-Parmeter, *From Amazon to Uber: Defining Employment in the Modern Economy*, 96 B.U. L. Rev. 1673, 1694, 1700-01 (2016); Bruce Goldstein et al., *Enforcing Fair Labor Standards in the Modern American Sweatshop: Rediscovering the Statutory Definition of Employment*, 46 U.C.L.A. L. Rev. 983, 984 (1999).

[7] Contrary to defendants' contention (U.S. Br. at 44), *Encino Motorcars, LLC v. Navarro* is inapposite. *See* 138 S. Ct. 1134 (2018). In *Encino*, the Court concluded that an exemption to FLSA should be read "fair[ly]" rather than "narrow[ly]." *Id.* at 1142 (quotation marks omitted).

(*continued on the next page*)

In keeping with the statute's plain language and history, more than eighty years of judicial precedents have utilized all three statutory definitions, and the "suffer or permit to work" standard in particular, to determine when two (or more) entities are joint employers under FLSA. For example, in *Rutherford*, the Supreme Court observed that no single FLSA definition "solves [the] problems as to the limits of the employer-employee relationship under the Act," 331 U.S. at 728. Accordingly, the Court in *Rutherford* relied on all three definitions, including the statute's broad definition of "employ" as "suffer or permit to work," in determining that a slaughterhouse operator was jointly liable with its meat-deboner contractor for wage-and-hour violations committed against the individuals doing the deboning work. *Id.* at 728-730 & n.6.

Defendants and intervenors fundamentally misconstrue *Rutherford* in contending that it did not involve joint employers. As this Court has concluded, "*Rutherford* was a joint employment case" given that the individuals conducting the work "were, first and foremost, employed by

_____

But the current case does not address any FLSA exemption. And *Encino* did not remotely authorize DOL to ignore Congress's intent to use broad and interrelated definitions of "employer," "employee," and "employ" to accomplish its remedial public purposes.

the [independent contractor] who had entered into a contract with the slaughterhouse." *Zheng*, 355 F.3d at 70; *see Rutherford*, 331 U.S. at 724-25. The Court in *Rutherford* thus determined that the slaughterhouse operator constituted an *additional employer*—i.e., a joint employer—also liable to the same individuals under FLSA. (*See* S.P.A. 66-67.) Indeed, this Court and many other courts have long relied on *Rutherford* as a foundational opinion on joint employment under FLSA. *See, e.g.*, *Zheng*, 355 F.3d at 70; *Layton v. DHL Express (USA), Inc.*, 686 F.3d 1172, 1180 (11th Cir. 2012); *Torres-Lopez v. May*, 111 F.3d 633, 638, 640 (9th Cir. 1997). And in keeping with *Rutherford*, many courts, including this Court, have "looked to all three definitions to determine whether an entity qualifies as a joint employer" because it suffers or permits an individual to work. (S.P.A. 56-57 (collecting cases).) *See, e.g.*, *Zheng*, 355 F.3d at 66, 69-70; *Barfield v. New York City Health & Hosps. Corp.*, 537 F.3d 132, 140-42 (2d Cir. 2008). Accordingly, the Rule contravenes FLSA by rendering the "suffer or permit to work" standard irrelevant to the joint-employer inquiry.

## 2. The Rule's separate standard for identifying joint employers improperly restricts Congress's broad standard for identifying any employer.

As the district court correctly concluded (S.P.A. 57-60), the Rule is contrary to law for the related reason that it imposes two separate standards for identifying employers liable under FLSA—one for direct employers and another for joint employers—and thereby improperly exempts certain entities from the single, broad standard that Congress applied to identify any employer-employee relationship under FLSA.

The Rule creates two different classes of putative employers and treats them differently for purposes of discerning FLSA liability. As the Rule acknowledges, DOL will continue to use the statute's broad "suffer or permit to work" standard to discern whether one entity directly employs a particular individual as an employee under FLSA. (*See* S.P.A. 201.) But once such an employer is deemed to exist, DOL will not apply the "suffer or permit to work" standard to determine whether any other entity also employs the same individual. Instead, DOL will apply its separate joint-employer test, under which no additional entity can be liable under FLSA unless it actually controls the conditions of the individual's employment. (*See* S.P.A. 201, 195-196.)

47

The Rule's novel two-test approach lacks any grounding in the statute and plainly contravenes Congress's provision of a single, comprehensive standard to govern when there is an employer-employee relationship under FLSA. The Act does not create two separate categories of employers and does not institute two separate frameworks for identifying the entities that purportedly fall into either category. Indeed, the Act does not use the term "joint employer" at all, let alone provide that such entities are liable for wage-and-hour violations only if they actually control a worker's employment conditions. Instead, Congress provided that in any potential employer-employee relationship, the governing inquiry is whether the putative employer "suffer[s] or permit[s]" the putative employee "to work." 29 U.S.C. § 203(g). The Act thus treats all potential employers in the same manner, examining the economic realities of each putative employer's relationship to the putative employee. *See Torres-Lopez*, 111 F.3d at 641 (rejecting inquiry into whether workers were "more" dependent on one potential employer than another (emphasis omitted)).

There is thus no textual basis for DOL's contention (U.S. Br. at 39-40) that the Rule satisfies FLSA by using the "suffer and permit to

work" standard to determine when an entity is a direct employer, while ignoring that standard and relying on the term "employer" to apply an actual-control test to determine when any additional entity can be considered a joint employer. As the district court correctly explained, there is no plausible basis for applying the definition of "employer" solely to joint employers and not to direct employers because the definition of "employer" always incorporates the definition of "employee," which in turn always incorporates the broad "suffer or permit to work" standard. 29 U.S.C. § 203(d) ("employer" defined in reference to having an "employee"). Moreover, by stating that "employer" "*includes* any person acting directly or indirectly in the interest of an employer," *id.* (emphasis added), Congress plainly applied this term to more than one type of employer rather than solely to joint employers (S.P.A. 60-61). *See Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142, 162 (2012) (use of "includes" rather than "means" demonstrates that "examples enumerated in the text are intended to be illustrative, not exhaustive"). FLSA simply does not contain a more lenient test for joint employers than for direct employers, as the Rule assumes; instead, it adopts a single, broad

definition of the applicable employer-employee relationship that relies on the interrelatedness of the terms "employer," "employee," and "employ."

Defendants' attempt to justify the Rule's two-test approach by insisting that determining whether one entity is liable under FLSA turns on whether the worker is that entity's "employee," but determining whether any additional entity is also liable under FLSA turns on whether that entity is an "employer." (U.S. Br. at 40-41.) But the Rule's interrelated definitions cannot be disaggregated and turned into asymmetrical standards for evaluating employment under FLSA. See *supra* at 41-44. And defendants' argument defies the commonsense understanding, reflected in FLSA's definitions, that there is no meaningful difference between determining whether an individual is the "employee" of an entity or determining whether an entity is the "employer" of an individual. "[W]hether one entity is a worker's 'employer' under the FLSA" is the same inquiry, "framed in reverse," as "whether an individual is an entity's 'employee.'" *Salinas*, 848 F.3d at 139. The standard for discerning FLSA liability thus remains the same whether there ends up being one, two, or more entities that are "employers" of the relevant "employees."

### 3. The Rule's actual-control test for joint employers limits the scope of the Act in ways that Congress specifically rejected.

As the Supreme Court, this Court, and many other courts have concluded, Congress enacted FLSA to go beyond the common-law definition of employment, which is based on narrow concepts of an employer's formal control and supervision over an employee's working conditions. *See Darden*, 503 U.S. at 325-26; *Zheng*, 355 F.3d at 69; *see also, e.g.*, *Antenor v. D & S Farms*, 88 F.3d 925, 929 (11th Cir. 1996). Instead, in FLSA, Congress instituted a broad standard that examines the economic realities of each putative employer-employment relationship—a standard purposefully designed to include as employers many entities that do not "directly supervise putative employees." *Antenor*, 88 F.3d at 933. Indeed, Congress rejected common-law control principles and instituted its broad "suffer or permit to work" standard to prevent employers from evading FLSA liability by using middlemen, contractors, or other business relationships to directly control employees' working conditions. See *supra* at 6-7, 38, 43-44.

The Rule's actual-control test for joint employers, which requires an entity actually to control an individual's working conditions to be

51

liable under FLSA (S.P.A. 192), flies in the face of Congress's intent and this Court's established precedent. Importantly, the Rule's four actual-control factors are not merely relevant to the Rule's joint-employer inquiry. To the contrary, the Rule makes actual control mandatory: where one entity is already liable under FLSA, no other entity may be an "employer" unless it "actually exercise[s] . . . one or more of the four control factors." (S.P.A. 192.) Although the Rule purports to allow consideration of other factors, any such factors still must indicate "significant control over the terms and conditions of the employee's work" to be considered. (S.P.A. 193.) And the Rule's joint-employer test is even narrower than the common-law agency standard because it requires that the potential joint employer *actually exercise control* over the employee (S.P.A. 159), rather than simply having the authority to control employment conditions.[8] This extraordinarily narrow actual-exercise-of-control test "cannot be reconciled with the 'suffer or permit' language in the statute, which necessarily reaches beyond traditional agency law" and requires examination of all

---

[8] *See generally* Restatement (Second) of Agency § 2 (Mar. 2021 update) (Westlaw) (common law boundaries of the agency relationship focused on whether a principal "controls or has the right to control the physical conduct of the other in the performance of the service").

of the economic realities of a potential employer-employee relationship. *Zheng*, 355 F.3d at 69.

The Rule's radical and unexplained break from DOL's own long-standing interpretation of FLSA further confirms that the Rule contravenes the statute. Before it issued the Rule, DOL had repeatedly concluded that the joint-employer inquiry under FLSA and MSPA, which incorporates FLSA's joint-employer principles, "is not a control test" (S.P.A. 144), and instead turns on the broad economic realities of each situation (*see* S.P.A. 30-34 (collecting regulations and guidance)). Although DOL is not required always to adhere to its prior interpretations, DOL's prior conclusions about FLSA were based on its long-standing analysis of the statute's language and history, as well as eighty years of judicial precedents. In the Rule, DOL utterly failed to explain why its prior statutory analysis may have been wrong. See *infra* at 61-62. This silence further demonstrates that FLSA precludes an actual-control test for joint employment—as judicial and administrative precedents have long established.

Contrary to the defendants' contentions (U.S. Br. at 42; Intervenors Br. at 36), *Falk v. Brennan*, 414 U.S. 190 (1973), does not support the

53

Rule's actual-control test. In *Falk*, the Court's one-paragraph joint-employer analysis concluded that a management-services company was "unquestionably" liable under FLSA because it had significant control over the workers' employment conditions, *id.* at 195—a conclusion that rendered any further inquiry into the broader economic realities unnecessary. But the parties here do not dispute that an entity's control over workers' employment conditions is *sufficient* to establish FLSA liability. Rather, one of the many problems with the Rule is that it makes such actual control the *necessary and exclusive* means to establish FLSA liability whenever one entity is already an FLSA employer. *See Zheng*, 355 F.3d at 71-72 (control-related factors may be *"sufficient* to establish employer status" but such factors are not "*necessary* to establish an employment relationship" (emphasis in original)). *Falk* does not remotely establish or authorize any such mandatory actual-control standard. To the contrary, the *Falk* Court emphasized the "expansiveness" of FLSA's definition of "employer." *Falk*, 414 U.S. at 195. And in broadly construing the term "employer," the Court relied not only on the definition of "employer" but also on the definition of "employee," *id.*—which incorporates the sweeping "suffer or permit to work" standard.

54

For similar reasons, defendants misplace their reliance on *Bonnette*, 704 F.2d 1465. (*See* U.S. Br. at 46; Intervenors Br. at 8-9, 39-40.) In *Bonnette*, the 9th Circuit stated that four factors—the putative employer's (1) power to hire and fire workers; (2) supervision or control over employment conditions; (3) determination of payment rates and methods; and (4) maintenance of employment records—provided a "useful" and "relevant" starting point for identifying employer-employee relationships under FLSA. 704 F.2d at 1470. But the court in *Bonnette* emphasized that the listed factors were not "etched in stone" and should not be "blindly" applied. *Id.* Rather, the *Bonnette* court explained, the "determination of whether an employer-employee relationship exists" under FLSA "is not limited by the common law concept of 'employer,'" and must utilize an "expansive interpretation" that considers "the circumstances of the whole activity" given "FLSA's broad remedial purposes." *Id.* at 1469 (quotation marks omitted). Accordingly, *Bonnette* did not purport to impose its four factors as necessary or exhaustive conditions for identifying joint

55

employers, and instead explained why such a mandatory control-factor test, like the one imposed by the Rule here, would violate FLSA.[9]

Indeed, in *Zheng*, this Court already expressly determined that the four *Bonnette* factors cannot be used as the mandatory or exclusive considerations in determining joint employment under FLSA because Congress rejected any such rigid control-only test. *Zheng*, 355 F.3d at 69 (reversing district court decision that relied solely on the four factors); *see also In re Enterprise Rent-A-Car Wage & Hour Emp't Practices Litig.*, 683 F.3d 462, 468-70 (3d Cir. 2012). Defendants miss the mark in arguing that DOL was not required to use the precise factors identified by this circuit or any other court. (*See* U.S. Br. at 47-48.) Whatever deference the Court might afford DOL in highlighting factors that are particularly relevant to determining FLSA liability, DOL has no authority to make its actual-control factors the necessary and exclusive means of finding

---

[9] As the district court correctly explained, the other circuit cases on which defendants rely (*see* U.S. Br. at 46) likewise used the factors listed in *Bonnette* as relevant but not necessary conditions to identifying employer-employee relationships under FLSA, including in joint-employer scenarios. And in those cases, the courts repeatedly emphasized that the joint-employer inquiry under FLSA reaches beyond common-law principles of control. (*See* S.P.A. 76-77 (collecting cases).)

56

joint employers liable under FLSA, in contravention with the statute's terms, FLSA's history, and this Court's binding precedent. *See Catskill Mountains Chapter of Trout Unlimited, Inc. v. City of New York*, 451 F.3d 77, 83-85 (2d Cir. 2006) (affording no *Skidmore* deference to agency interpretation that contradicted governing statute and Court's prior interpretation of that statute). The Rule is thus not entitled to any *Skidmore* deference and is contrary to law.

The intervenors are also incorrect in arguing that the Rule's narrow actual-control test is supported by a purported legal distinction between cases that involve joint employers and cases that involve independent contractors. (Intervenors Br. at 9-10, 37-38.) In *Zheng*, this Court expressly rejected such a distinction and held that FLSA's broad "suffer or permit to work" standard—including as that standard has been developed in cases involving independent-contractor status—applies to determining joint employment. *See Zheng*, 355 F.3d at 67-69. As the Court explained, particular factors might be more or less relevant to either of these factual scenarios, but FLSA simply does not support limiting its broad definitions to the independent-contractor context. *Id.* at 67-71. Indeed, FLSA does not use or define the terms "joint employer" or "independent contractor,"

and imposes only a single, broad standard for evaluating employee-employer relationships. See *supra* at 47-50. The intervenors' purported legal distinction between joint employers and independent contractors thus lacks any grounding in FLSA's plain language or history.

### 4. The Rule's categorical rejection of certain important economic factors impermissibly limits the joint-employer inquiry.

The Rule is also contrary to law because it categorically excludes from consideration certain important factors that both courts and DOL have held to be integral to FLSA's broad economic-realities test. For example, the Rule provides that whether an employee is "economically dependent" on an entity is always irrelevant to determining whether that entity is a joint employer under FLSA and lists examples of factors that cannot be considered because they bear on economic dependence. (S.P.A. 247.) But courts, including the Supreme Court, have repeatedly emphasized that a worker's economic dependence on an entity is central to the determination of whether that entity is an employer under FLSA. *See, e.g.*, *Rutherford*, 331 U.S. at 730 (relying on worker's "specialty job" for slaughterhouse in finding joint-employer liability); *Layton*, 686 F.3d

at 1178 ("focus" should be "economic dependency" in "considering a joint-employment relationship" (quotation marks omitted)).

Indeed, the Rule acknowledges that "[e]conomic dependence is relevant" in determining "whether a worker is an employee under" FLSA. (S.P.A. 193.) But as explained, the broad principles that govern who is an "employee" under FLSA cannot be divorced from the factors that govern which entities are "employers" under FLSA. See *supra* at 40-46. Because a worker's economic dependence on one entity is indisputably relevant to determining whether that entity is liable under FLSA, the same worker's economic dependence on other entities must also be relevant to determining whether those entities are also liable under FLSA. (*See* S.P.A. 78-79.)

The Rule further contravenes the Act by excluding from consideration other factors, including "certain business models (such as a franchise model), certain business practices (such as allowing the operation of a store on one's premises), and certain contractual agreements (such as requiring a party in a contract to institute sexual harassment policies)." (*See* S.P.A. 193.) This absolute bar on considering certain factors cannot be squared with Congress's broad mandate to consider "the circumstances

59

of the whole activity" rather than "isolated factors." *Rutherford*, 331 U.S. at 730. Notably, as the district court correctly explained (S.P.A. 79-81), the Rule does not provide that certain factors are insufficient standing alone to establish liability, but rather precludes *any* consideration of such factors—even if a factor is highly probative of an employer-employee relationship under the particular facts presented. This categorical exclusion is contrary to the holistic inquiry that is built into FLSA's broad terms.

## B.  The Rule Is Arbitrary and Capricious.

In addition to being contrary to law, the Rule's new interpretation of FLSA is also arbitrary and capricious. The APA requires agencies to "engage in reasoned decisionmaking." *Department of Homeland Sec. v. Regents of Univ. of Cal.*, 140 S. Ct. 1891, 1905 (2020) (quotation marks omitted). An agency must "articulate a satisfactory explanation for its action" that demonstrates that it has considered the "relevant factors" and has not missed any "important aspect of the problem" or made any "clear error of judgment." *Motor Vehicles Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 42-43 (1983) (quotation marks omitted). And where, as here, an agency reverses course, it must "display awareness that it is changing position," supply "a reasoned analysis for the

60

change," and provide "good reasons for the new policy." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 514-15 (2009) (emphasis omitted).

DOL failed to discharge these obligations here. The district court thus properly found the Rule arbitrary and capricious. *See* 5 U.S.C. § 706(2)(A).

### 1. The Rule fails to provide a reasoned explanation for the Department of Labor's change in position.

As the district court correctly concluded, the Rule is arbitrary and capricious because it fails to explain why DOL drastically departed from its prior interpretations of FLSA. (S.P.A. 81-83.) In its 1997 regulation regarding MSPA and its 2014 and 2016 guidance regarding FLSA, DOL explained that FLSA did not permit rigid control tests and instead required application of the sweeping "suffer or permit to work" standard for evaluating joint-employer liability. DOL based its prior interpretations on its own extensive analysis of FLSA's plain language, its history, and eighty years of judicial precedents.

The Rule entirely reverses course without adequate explanation. Defendants point to the Rule's recitation of the joint-employer doctrine's history. (*See* U.S. Br. at 51; Intervenors Br. at 43.) But this part of the

Rule merely mentions DOL's prior administrative interpretations in providing basic factual-background information. (*See* S.P.A. 194-195.) As defendants acknowledge (U.S. Br. at 54), the Rule does not address—let alone provide a reasoned explanation for—DOL's decision to abandon its prior interpretations. This failure renders the Rule arbitrary and capricious. *See Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2125 (2016).

Defendants and intervenors argue that the Rule adequately addresses its change in position by purporting to provide clarity and resolve differences between the joint-employer factors often considered by different circuit courts. (U.S. Br. at 51-53; Intervenors Br. at 43-44.) But these claimed rationales do not acknowledge DOL's change in position or address why DOL now thinks that its prior, extensive statutory analyses were incorrect.

### 2. The Rule fails to meaningfully consider the extensive harms to workers that it will cause.

DOL also acted arbitrarily and capriciously in failing to adequately consider or justify the substantial—and wholly unnecessary—harms that the Rule will cause to workers. By refusing to grapple with the Rule's harms, DOL irrationally "failed to consider an important aspect of the problem." *See State Farm*, 463 U.S. at 43; *Public Citizen, Inc. v. Mineta*, 340 F.3d 39, 55-58 (2d Cir. 2003) (vacating rule given agency's failure to consider costs); *Mingo Logan Coal Co. v. EPA*, 829 F.3d 710, 732-33 (D.C. Cir. 2016) (Kavanaugh, J., dissenting) ("[C]osts of an agency's action are a relevant factor that the agency must consider.").

The administrative record is replete with evidence that the Rule will severely harm workers. For example, extensive evidence confirmed that the Rule's less protective joint-employer standard will lead to more wage-and-hour violations as businesses adopt business practices that will not count for joint-employer status under the Rule. (*See, e.g.*, J.A. 374, 394-395, 548.) The evidence submitted to DOL also explained that these business practices—such as subcontracting, outsourcing, and using temporary staffing agencies, contract workers, and on-call workers—leave workers particularly vulnerable to lower wages, wage-theft,

63

retaliation, and an inability to collect back wages because employers become insolvent. (*See, e.g.*, J.A. 374-380, 394-397, 420-424, 450-455, 494-496, 543-547.) For example, the Economic Policy Institute estimated that the Rule will cost workers approximately $1 billion in wages per year due to lower wages and wage-theft caused by increased outsourcing, subcontracting, and use of staffing agencies. (J.A. 375-380 (explaining calculations to reach that estimate).)

Contrary to defendants' contentions (U.S. Br. at 55-56; Intervenors Br. at 45-47), the Rule did not adequately address these extensive economic harms; it merely mentioned them and then baselessly dismissed them. The Rule acknowledges in passing that the Rule may reduce workers' ability to collect back wages under FLSA and then refuses to consider any such harms because DOL purportedly did "not believe there are data to accurately quantify the impact" of the Rule. (S.P.A. 237.) As an initial matter, DOL is simply incorrect that it lacked data regarding the Rule's harms given that commenters provided such empirical evidence. (*See, e.g.*, J.A. 375-380, 394-395.) DOL did not provide any explanation, let alone a reasoned explanation, for why it concluded that this evidence was inaccurate.

In any event, DOL's rote invocation of purported uncertainty about precise quantifications of the Rule's harms is arbitrary and capricious. *See State Farm*, 463 U.S. at 52 (agency may not "merely recite the terms 'substantial uncertainty' as a justification for its actions"). Even if the precise magnitude of a policy's effects is uncertain, the agency may not simply disregard those effects. *Public Citizen v. Federal Motor Carrier Safety Admin.*, 374 F.3d 1209, 1219 (D.C. Cir. 2004). Rather, the agency is obligated "to make tough choices" about which estimate "is most plausible, and to hazard a guess as to which is correct, even if the lack of [data] . . . means that the estimates will be imprecise." *Id.* at 1221. DOL utterly failed to do so here.

Moreover, as the district court correctly observed, DOL's failure to consider the purportedly unquantifiable harms caused by the Rule was also irrational because DOL relied on the purported benefits from the Rule without ever attempting to quantify those benefits. DOL failed to provide any explanation for the agency's application of such a double-standard. And because DOL simply disregarded the Rule's harms based on the purported lack of data, the agency failed to explain how the Rule's

purported provision of unquantifiable "clarity" could outweigh extensive economic harm to workers.

Indeed, DOL's refusal to meaningfully address the Rule's harms to workers is particularly unreasonable here given that FLSA's foundational purpose is to protect workers. As explained above, Congress enacted FLSA and included joint employers within the statute's broad reach to improve working conditions, increase employees' ability to collect back pay for wage-and-hour violations, and prevent employers from evading FLSA liability. DOL's failure to consider the ways in which the Rule severely undermines Congress's remedial purposes to the detriment of workers is arbitrary and capricious.

### 3. The Rule failed to consider its creation of conflict between two statutes that Congress intended to mirror each other with respect to joint employers.

The Rule is also irrational because DOL did not consider that the Rule triggers conflict between the application of FLSA and MSPA to putative joint employers. (S.P.A. 83.) Joint-employer liability under MSPA will continue to be evaluated under the broad "suffer or permit to work" standard. *See* 29 C.F.R. § 500.20(h)(1). Accordingly, under MSPA, DOL will continue to consider, among other things, all of the economic

realities surrounding a potential employer-employee relationship, including whether the worker "economically depend[s]" on the putative joint employer. *Id.* § 500.20(h)(5). The Rule thus results in DOL applying the Rule's novel and narrow actual-control test under FLSA and the well-established and broad economic-realities test under MSPA.

DOL's failure to address its use of these two different and conflicting joint-employer standards is arbitrary and capricious. Congress plainly intended for the same joint-employer standard to apply under both FLSA and MSPA. *See id.* § 500.20(h)(5)(i) ("Joint employment under the [FLSA] is joint employment under the MSPA."). But without explanation, the Rule violates Congress's intent to apply a uniform standard across both statutes. Defendants' belated attempt in their appellate brief to reconcile the conflict between the two statutes (U.S. Br. at 53-54) is nothing more than a post-hoc rationale that the Court should not consider. *See Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 419 (1971). In any event, defendants' arguments are incorrect because they conflict with the plain language of both MSPA and FLSA. See *supra* at 9-10, 53. Moreover, the Rule failed to consider the confusion and costs that flow from applying two different standards to employers.

67

## CONCLUSION

The Court should affirm the judgment of the district court.

Dated:  New York, New York
        April 16, 2021

                                   Respectfully submitted,

                                   LETITIA JAMES
                                     *Attorney General*
                                     *State of New York*
                                   Attorney for Appellees


                             By:   */s/ Steven C. Wu*
                                   STEVEN C. WU
                                   Deputy Solicitor General

BARBARA D. UNDERWOOD               28 Liberty Street
  *Solicitor General*              New York, NY 10005
STEVEN C. WU                       (212) 416-6274
  *Deputy Solicitor General*
JUDITH N. VALE
  *Senior Assistant Solicitor General*
FIONA J. KAYE
  *Assistant Attorney General*
     *of Counsel*

(*Counsel listing continues on the next two pages.*)

68

MATTHEW RODRIQUEZ
  *Acting Attorney General*
  *State of California*
1300 I Street
Sacramento, CA 95814

PHILIP J. WEISER
  *Attorney General*
  *State of Colorado*
1300 Broadway
Denver, CO 80203

KATHLEEN JENNINGS
  *Attorney General*
  *State of Delaware*
820 N. French Street
Wilmington, DE 19801

KWAME RAOUL
  *Attorney General*
  *State of Illinois*
100 West Randolph Street
Chicago, IL 60601

BRIAN E. FROSH
  *Attorney General*
  *State of Maryland*
200 St. Paul Place
Baltimore, MD 21202

MAURA HEALEY
  *Attorney General*
  *Commonwealth of Massachusetts*
1 Ashburton Place
Boston, MA 02108

DANA NESSEL
  *Attorney General*
  *State of Michigan*
P.O. Box 30212
Lansing, MI 48909

KEITH ELLISON
  *Attorney General*
  *State of Minnesota*
445 Minnesota Street
St. Paul, MN 55101

GURBIR S. GREWAL
  *Attorney General*
  *State of New Jersey*
Richard J. Hughes Justice
  Complex
25 Market Street
Trenton, NJ 08625

HECTOR BALDERAS
  *Attorney General*
  *State of New Mexico*
P.O. Drawer 1508
Santa Fe, NM 87504

69

ELLEN F. ROSENBLUM
  *Attorney General*
  *State of Oregon*
1162 Court Street NE
Salem, OR 97301

MARK R. HERRING
  *Attorney General*
  *Commonwealth of Virginia*
202 North Ninth Street
Richmond, VA 23219

JOSH SHAPIRO
  *Attorney General*
  *Commonwealth of Pennsylvania*
1600 Arch Street
Philadelphia, PA 19103

ROBERT W. FERGUSON
  *Attorney General*
  *State of Washington*
1125 Washington Street SE
P.O. Box 40100
Olympia, WA 98504

PETER F. NERONHA
  *Attorney General*
  *State of Rhode Island*
150 South Main Street
Providence, RI 02903

KARL A. RACINE
  *Attorney General*
  *District of Columbia*
441 4th Street, N.W.
Washington, DC 20001

THOMAS J. DONOVAN, JR.
  *Attorney General*
  *State of Vermont*
109 State Street
Montpelier, VT 05609

70

## CERTIFICATE OF COMPLIANCE

Pursuant to Rule 32(a) of the Federal Rules of Appellate Procedure, William P. Ford, an employee in the Office of the Attorney General of the State of New York, hereby certifies that according to the word count feature of the word processing program used to prepare this brief, the brief contains 12,841 words and complies with the typeface requirements and length limits of Rule 32(a)(5)-(7) and Local Rule 32.1.

_/s/ William P. Ford_